JAMES LARK ET AL.
vs.
LANDAY LINSTEAD ET AL.
}  SEPTEMBER TERM, 1850.

JURISDICTION—LEGACY—EVIDENCE—AUTHORITY OF EXECUTOR TO DISPOSE OF AS-
SETS—ACT OF 1834, CH. 304.

THE jurisdiction of chancery in regard to legacies is undoubted, and is exer-
cised as a matter of trust.

No action will lie at law to recover a specific legacy unless the executor has
assented thereto, or in the case of a pecuniary legacy unless the executor has
promised to pay it, but a court of equity, regarding the executor as a trustee,
will compel him to assent and pay the legacy.

Evidence of declarations made by a vendor after a sale out of the presence of
the vendee, in reference to the title of thing sold, declared inadmissible.

Where a sole executor is at the same time guardian, the law will adjudge his
ward's proportion of the estate to be in his hands, as guardian, after the ex-
piration of the time fixed by law for the settlement of the estate, whether he
has passed a final account as executor or not.

But it does not, therefore, follow that the authority of the executor to dispose
of the estate of his testator, terminates in every case on the expiration of the
period limited for the passage of the final account.

Before the act of 1843, ch. 304, executors, &c., might dispose absolutely of the
*whole* personal estate of a deceased person, and neither creditors nor legatees
could pursue the property in the hands of the purchaser, except where collu-
sion was proved between the purchaser and the executor, &c.

[The bill, in this case, was filed on the 28th of October, 1849,
by the complainants as the legatees in reversion of Greenbury
Lark, praying for the sale of a negro which was purchased by
the defendant, Linstead, in the year 1829, from Amelia Lark,
the widow, executrix and legatee for life of the said Greenbury.
It alleges, that the said Amelia could only have sold her *life
estate* in the said boy, as the estate of her husband had been
settled up before the said sale by the said executrix. They
also pray for an account of the hires of the said boy since the
death of the said Amelia.

The defendant, Linstead, filed his answer, which is sufficient-
ly set forth in the Chancellor's opinion. Testimony was taken
and returned. The defendant, Linstead, excepted to so much
of the testimony as relates to the declarations of Mrs. Lark,

made subsequent to the sale ; and also, to the jurisdiction of the court, because the complainant had a full remedy at law.]

THE CHANCELLOR :

I am of opinion that the objection to the jurisdiction of this court to grant relief in a case like the present cannot be sustained.

The complainants claim, as legatees, in remainder, under the will of Greenbury Lark, after the death or widowhood of his wife, Amelia Lark, whom he constituted his executrix, and to whom, *durante viduitate*, he devised and bequeathed his entire estate, real and personal, with remainder to his children, the complainants, share and share alike.

It may be inferred, from the authorities and treatises upon the subject, that the original jurisdiction over legacies was claimed and exercised in the temporal courts of common law ; or, in the language of an eminent judge, "it was a jurisdiction, *mixti fori*, exercised in the county court, where the bishop and sheriff sat together." Afterwards, the ecclesiastical courts obtained exclusive jurisdiction over the subject of legacies, as incident to the probate of wills of personal property ; but this jurisdiction, though it still subsists, is not invoked—a concurrent though much more efficient jurisdiction being exercised by courts of equity. The jurisdiction of chancery, in these cases, is vindicated upon various grounds, and especially, upon the ground, that the executor is treated as a trustee for the benefit of the legatees, which, of itself, and independent of all other reasons, would be abundant authority for the interposition of this court. 2 *Roper on Legacies, ch.* 25, *pp.* 536, 537 ; 1 *Story's Equity, secs.* 589, 590, 591, 592, 593.

It will be found, upon examining the cases cited by Judge Story in the sections just referred to, and in the case of *Wind.* vs. *Jekyll,* 1 *P. Wm.,* 575, that though no action will lie at law to recover a legacy, until, in the case of a specific legacy, the executor has assented thereto ; or, in the case of a pecuniary legacy, he has promised to pay it, that a court of equity, regarding the executor as a trustee, will compel him to assent and pay the legacy as a matter of trust. 1 *Story's Eq., sec.* 540.

It is not, therefore, necessary to inquire, in this case, whether the facts and circumstances are sufficiently strong to infer the assent of the executor to the legacy in question, as we are now in a court of equity, where, in a proper case, relief may be granted irrespective of any such assent.

The bill charges that the negro, John, the subject of the suit, constituted a portion of the personal estate of the testator, and that an interest not exceeding her life estate was sold by Amelia Lark, his executrix and legatee for life, to the defendant, Linstead, who knew she had but a life estate, and was not authorized to sell for a longer term. Special interrogatories are propounded to the defendant, to the following effect:—1st. At what time he purchased and took possession of the said boy, and whether he did not then know that Amelia Lark was the tenant for life only ; and 2d. Requiring the said defendant to disclose the amount of purchase money which was paid for the said slave, and for what period of time he purchased him. In the bill it was also averred, that the executrix, prior to the sale of the said negro boy to the defendant, Linstead, had sold of the personal estate of the testator, a sufficient amount to pay off his debts and the costs and expenses of the administration, and that at the time of the sale in question, she was in possession of and held the property as tenant for life under her husband's will.

The answer denies this latter allegation, and says the negro was sold to him by the executrix to raise funds, as he believes, to pay claims against the estate of her testator, of which there remained some outstanding and unsatisfied. That he purchased the boy in November, 1829, *bona fide* and for a fair price as a slave for life, and that he dealt with said executrix as having full authority to sell the boy for the life of the boy, and that he did not know that said executrix had only a life interest in him when he purchased ; and in answering the general interrogatories, the defendant recapitulates these statements, and insists that he has acquired a full and absolute title to the property thus purchased.

Greenbury Lark, the testator, died in December, 1826, and his executrix returned an inventory of his personal estate in

March, 1827, in which there is included a negro woman and child, (the latter supposed to be the boy in dispute,) appraised together at $250.   On the 25th November, 1828, she passed before the Orphans Court what is called her first and final account, in which she is allowed for payments and disbursements the sum of $168 28, leaving due the estate $698 11 ; and on the 27th of June, 1829, she passed in the same court, her additional final account, in which the credits allowed amount to $130 83, and the balance in her hands due the estate was $567 28.

Upon this state of facts, the question arises as to the nature and duration of the interest which the defendant, Linstead, acquired in this boy.   That he purchased or thought he was purchasing a slave for life, must be assumed in the absence of any evidence contradicting the answer which, in this respect, is directly responsive to a special interrogatory in the bill.   I say in the absence of any opposing proof, because I lay out of the case, as totally inadmissible, the declarations of Mrs. Lark not in defendant's presence, made subsequent to the sale, and to the admissibility of which exceptions have been filed by the defendant.

Evidence has been offered for the purpose of showing that the defendant gave much less than the value of the boy, in order to create an inference that he purchased only for the life of the vendor.   But I confess I have not been much impressed by this evidence ; the answer says, the boy at the time of the purchase was between two and three years of age ; and although the evidence throws some doubt on the accuracy of the statement, the proof is not sufficiently distinct and explicit to render it quite certain that the defendant was much in error in regard to it.   If the child was but two or three years old, or even a year or two older, the price given, say $35, though less than the witnesses say negro children of that age were worth, is not so low as of itself to create a presumption strong enough to contradict the answer and lead to the conclusion in the face of the answer, that the defendant did not purchase the child for life.   Indeed, there is some degree of improbability in the

plaintiff's assertion that the defendant purchased this negro child, not for the life of the child, but for the life of Mrs. Lark, because upon the latter hypothesis, he ran great risk of being burdened with the support of the child during its infancy, without the prospect of deriving any advantage from it when old enough to labor. It does not seem very probable that a cautious person would purchase a negro child of tender age for the life of another person, and that person, as we may infer from the evidence, past the meridian of life. But be this as it may, there is certainly nothing in the evidence of force sufficient to break down an answer directly responsive to an interrogatory in the bill; and I must, therefore, consider the case upon the assumption that the defendant intended to purchase, and honestly believed he was purchasing, a slave for life.

The complainants' counsel, to support their title to the aid of the court, rely upon that class of cases by which it has been decided, that a party filling the twofold character of executor and guardian, the law will adjudge his ward's proportion of the property to be in his hands as guardian, after the time limited by law for the settlement of the estate, whether such settlement has or has not been made. *Watkins* vs. *State, use of Shaw*, 2 *G. & J.*, 220.

This principle is supposed to be applicable to, and decisive of, this case; and that, inasmuch as a final account had actually been passed by Mrs. Lark, and the period allowed by law for the settlement of the estates of deceased persons had elapsed before the sale to Linstead was made, it must be inferred as a matter of law that she was in possession of the property as legatee for life, and that she could only dispose of it in that capacity.

In determining the question of the responsibility of one of two sets of sureties, where one and the same person occupies the double capacity of executor and guardian, it frequently becomes necessary to fix the precise time where the liability of the one ends and the other commences; and no better time could be fixed than that at which the law says the duty of the one shall cease and the other begins. But it by no means fol-

lows, that because the responsibility of the bond of a sole executor is thus discharged by this legal transmutation of the property from his hands as executor to his hands as guardian, that in every case, the authority of an executor over the personal estate of his testator terminates with the period limited by law for the settlement of the estate, or the passage of what may be called a final account. Indeed, in the case already referred to, the principle is adjudged not to be applicable to the case of two executors, whose authority over the assets remains, notwithstanding the period allowed by law for the settlement of the estate has expired.

No case has been produced, and it is believed, none can be produced, which decides that the authority of executors to dispose of the assets of their testators, terminates with the period allowed by our testamentary system, for the settlement of the estates of deceased persons; and it is well known that they have, unchallenged, and, in numberless instances, executed the power to dispose of the assets long after that period.

The sale, in this case, by the executrix to the defendant, Linstead, was made in 1829, before the passage of the act of Assembly, which prohibits thereafter executors or administrators from selling the property of their testators or intestates, without the previous authority of the Orphans Court granting the letters, and, consequently, the title of this purchaser is unaffected by that act. The question is, therefore, to be decided without reference thereto, and depends upon the state of the law at the period of the sale; and there can be no doubt that by the general rule at that time, both in the courts of law and equity, executors or administrators might dispose absolutely of the whole personal effects of their testators or intestates, and that neither creditors nor legatees, either general or specific, could pursue the property in the hands of the purchaser, and that, in the language of an eminent judge, "what becomes of the price is of no concern to him." The only exception to this general rule will be found in those cases where collusion exists between the purchaser and the personal representatives. 2 *Wms. Exs.*, 609, 610, 611.

In the case of *Allender* vs. *Riston,* 2 *G. & J.,* 86, the Court of Appeals, in the most explicit terms, recognise the rule, that if there be no collusion, the bare act of sale of the assets "by the executor is a sufficient indemnity to the purchaser." No intimation is to be found any where or in any of the numerous cases in which the above principle has been decided, to the effect that the power of the executor to dispose of the personal estate of the testator terminates with the period allowed by law for settling the estate, and in the case of *Allender* vs. *Riston,* it is I think, very fairly to be inferred, that though the mortgage was executed eight years after the death of the intestate and six years after passing the account in the Orphans Court, it would have been considered a valid security in the hands of the mortgagee if it had appeared to have been executed by the administratrix in her representative character and no fraud or collusion had been shown. The question mainly discussed in that case, both at the bar and by the court, was, with reference to the power of an executor or administrator to dispose of the assets of the deceased in satisfaction of his own debt, and the court without absolutely deciding that question, held the disposition good, because it did not appear that the administratrix acted in her representative character, and the circumstances of the case were strong to show that the estate had been settled up, and that the property mortgaged fell to her share as distributee.

In the case we are now considering, there is no ground for imputing fraud or collusion with the executrix to the purchaser. In answer to interrogatories specially framed to extract the information from him, the defendant says, he purchased the boy *bona fide* and for a fair price as a slave for life, and that he dealt with the executrix as having full authority to sell for the life of the boy, and there is not to be found in the record, any admissible evidence to contradict the answer. I am therefore of opinion, that the defendant, Linstead, acquired a good title, and shall pass a decree dismissing the bill.

A. RANDALL and B. T. B. WORTHINGTON, for Complainants.
J. M. S. CAUSIN, for Defendants.